**Youssef AKBAR, Nassar Ghoushbeigui and Ahmad Moshavegh-Zade**

v.

**NEW YORK MAGAZINE CO., Joe Armstrong and Gregory F. Rose.**

Civ. A. No. 79–1553.

United States District Court, District of Columbia.

Feb. 12, 1980.

Marion H. Smoak, Shipley, Smoak & Akerman, Washington, D. C., for plaintiffs.

Ian D. Volner, Washington, D. C., for defendants.

## MEMORANDUM OPINION

*SUMMARY*

JOHN H. PRATT, District Judge.

This matter is before us on a motion to dismiss by defendant *New York* Magazine for lack of personal jurisdiction and improper venue or alternatively, to transfer this action to the Southern District of New York. For the reasons discussed below, we find this court has personal jurisdiction over defendant and that venue is proper. We therefore deny defendant's motion to dismiss or to transfer this action.

*FACTS*

Plaintiffs Youssef Akbar, Nassar Ghoushbeigui and Ahmad Moshavegh-Zade, all former employees of the Iranian Ministry of Foreign Affairs assigned to the Iranian Embassy in the District of Columbia, have brought this action for libel against defendants New York Magazine Company, Inc., its editor and publisher, Joseph Armstrong and a freelance writer, Gregory Rose. The action stems from an article entitled *The Shah's Secret Police are Here*,[1] written by defendant Rose and published in the September 18, 1978 issue of defendant *New York* Magazine. The article names plaintiffs as members of the SAVAK, the Persian acronym for the National Information and Security Organization, which the article describes as the Shah of Iran's secret police.

More specifically, plaintiff Akbar alleges that he served at the Iranian Embassy in the District of Columbia (hereinafter "Iranian Embassy") continuously from March 15, 1973 until March 21, 1979, when his assignment as a consul in charge of the Embassy's economic section was terminated. The article states that plaintiff Akbar was a SAVAK agent in the financial section of the SAVAK station at the Iranian Embassy and that the financial section was responsible for handling "payments to SAVAK agents and, sources allege, U.S. politicians, including some members of Congress." Article at 48. Plaintiff Ghoushbeigui alleges that he served at the Iranian Embassy from March 15, 1973 until March 21, 1979 [2] as a consul in the Persian Section of the Secretariat Office of the Embassy. The article states that plaintiff Ghoushbeigui was a member of the SAVAK station at the Iranian Embassy and that he "headed" the political-liaison section, whose "main targets" are "Congress and the White House." *Id.* Plaintiff Moshavegh-Zade alleges he was assigned to the Iranian Embassy as a consul in charge of the Embassy's Political Section. The article states that plaintiff Moshavegh-Zade was a SAVAK agent and a member of the SAVAK's Security Committee in the United States, "a body that sets priorities and supervises operations throughout the country." *Id.* Plaintiff Moshavegh-Zade alleges that upon his return to Iran in April, 1979 he was arrested, detained, and questioned concerning his alleged SAVAK activities.[3]

Plaintiffs deny they are SAVAK agents and, as a result of publication of the *New York* article, plaintiffs allege damage to their good name and reputation in the community, in their ability to earn a livelihood, in their relationships with their family and friends, and in being prevented from returning to Iran.

All three plaintiffs are citizens of Iran. Plaintiff Akbar claims temporary residency in Maryland, plaintiff Ghoushbeigui claims temporary residency in Virginia, and plaintiff Moshavegh-Zade now resides in Iran.

---

1. Rose, The Shah's Secret Police are Here, *New York* Magazine, September 18, 1978 at 45. (hereinafter "the article").

2. Plaintiff alleges this service was interrupted by a fifteen month leave of absence beginning in 1973.

3. Plaintiffs allege that the article was also distributed in Iran in a translated version.

Defendant New York Magazine Company, Inc. is a New York corporation with its principal place of business in New York. Defendants Armstrong and Rose are New York residents.[4]

An affidavit filed by defendant Armstrong states that *New York* is a weekly magazine edited and prepared for publication in New York City and printed in Buffalo, New York. Copies are mailed to subscribers from Buffalo and copies distributed to newsstands are shipped from Buffalo by truck. The Armstrong affidavit also states that New York Magazine has no office or property in the District of Columbia and is not licensed to do business in the District of Columbia.

This action is now before the court on a motion by defendant *New York* Magazine to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) and for improper venue pursuant to Rule 12(b)(3), Fed.R. Civ.P., or in the alternative to transfer this action because of improper venue to the Southern District of New York pursuant to 28 U.S.C. § 1406(a).

*ANALYSIS*

#### A. *The Motion to Dismiss for Lack of Personal Jurisdiction*

Plaintiffs have invoked this court's jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1350. At the outset, we note that jurisdiction does not rest under § 1350, which provides original jurisdiction of any civil action by an alien for a tort committed in violation of the law of nations or a treaty of the United States. No treaty concerning libel has been noted nor allegedly violated, and plaintiffs have not alleged any violation of "the law of nations" as the term has been interpreted by the courts. *See Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir. 1976); *ITT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975); *Valanga v. Metropolitan Life Ins. Co.*, 259 F.Supp. 324 (E.D.Pa.1966). We therefore treat the complaint as alleging jurisdiction based solely on diversity of citizenship. 28 U.S.C. § 1332(a).

**4.** The record indicates that service of process has not yet been obtained over defendants Armstrong and Rose.

It is well settled that in diversity cases, a federal district court is authorized pursuant to Fed.R.Civ.P. 4(e) and (f) to look to the law of the forum to determine in what manner and under what circumstances a party not present in the forum state can be subjected to the jurisdiction of a federal district court. *United States v. First National City Bank*, 379 U.S. 378, 381, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965). We therefore begin our inquiry by turning to the statutory provisions of the District of Columbia for exercising *in personam* jurisdiction over nonresidents. D.C.Code § 13–423 (Supp. V, 1978), the long-arm statute. The applicable portions of the statute are set out below:

> § 13–423 Personal jurisdiction based upon conduct
>
> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
>
> .    .    .    .    .
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

Thus, to acquire jurisdiction over defendants under § (a)(3), two requirements must be met: (1) a tortious injury within the District caused by (2) defendant's act or omission within the District. To acquire jurisdiction over defendants under § (a)(4), three requirements must be met: (1) a tortious injury within the District caused by (2) defendant's act or omission outside the District (3) if defendants had one of three enumerated "minimum contacts" with the District.

### 1. *Injury Within the District*

■ Defendant argues that the "injury" in a libel action must occur in plaintiffs' community, and that because plaintiffs are Iranian citizens temporarily residing in the Washington, D. C. metropolitan area, any injury that occurred must have occurred in Iran, their "community." We cannot agree. This Circuit's Court of Appeals has stated: "[U]nder the ultimate and broader standard a publication is defamatory if it tends to injure plaintiff in his trade, profession *or* community standing, or lower him in the estimation of the community." *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C. Cir. 1966) (emphasis supplied). *See DeSavitsch v. Patterson*, 159 F.2d 15, 17 (D.C. Cir. 1946).

Plaintiffs allege in their complaint that they are former diplomats assigned to the Iranian Embassy in Washington. Plaintiffs Akbar and Ghoushbeigui allege they served at the Embassy from March, 1973 until March, 1979. Plaintiff Moshavegh-Zade alleged he was assigned to the Iranian Embassy "at all times relevant herein." Taking as true these allegations, as we must for purposes of this motion to dismiss,[5] we find that foreign diplomats temporarily residing in the Washington Metropolitan area and having their principal place of business in the District of Columbia are in this community. Proof of an "injury" to their professional standing caused by a defamation constitutes an injury "in the District of Columbia" for the purposes of the District's long-arm statute.

### 2. *Minimum Contacts with the District*

■ Defendant's second argument is that they lack the minimum contacts with the forum necessary to subject them to this court's jurisdiction pursuant to § 13–423(a)(4). Section (a)(4) allows jurisdiction over a nonresident for a tortious injury occurring within the District by an act or omission *outside* the District only if certain minimum contacts, enumerated in the statute, are met. We note that for purposes of subjecting a news organization to personal jurisdiction for acts or omissions outside the District under § (a)(4), the mere act of newsgathering in the District is not to be considered as doing or soliciting business or engaging in a persistent course of conduct as those terms are used in § (a)(4). *See Margoles v. Johns*, 483 F.2d 1212, 1221–22 (D.C. Cir. 1973); *Bulletin Co. v. Origoni*, 387 F.2d 240 (D.C. Cir. 1967); *Layne v. Tribune Co.*, 71 F.2d 223 (D.C. Cir. 1934); *Neely v. Philadelphia Inquirer Co.*, 62 F.2d 873 (D.C. Cir. 1932). The question then becomes whether defendant *New York* Magazine "derives substantial revenue from goods used or consumed . . . in the District of Columbia."

The Armstrong[6] affidavit provides information leading to the following statement of defendant *New York* Magazine's revenues from subscription and newsstand sales in the District of Columbia for the specified dates:

|  | Sept. 11, 1978[7] | March 5, 1979 | Average |
|---|---|---|---|
| Total Circulation | 414,112 | 423,619 | 418,865.5 |
| Subscription and Newsstand Sales in the District | 2,872 | 2,992 | 2,932 |
| Percentage of District Sales to Total Sales | .693% | .706% | .6995% |
| Value on an annual basis of District Sales to Total Sales[8] | $32,223.84 | $33,570.24 | $32,897.04 |

---

5. *See Gardner, Secretary of Health, Education and Welfare, et al v. Toilet Goods Association, Inc., et al.*, 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704 (1967).

6. It is passing strange that defendant Armstrong has been sufficiently available for the purpose of supplying an affidavit but unavailable to receive service of process.

7. According to the Armstrong affidavit, September 11, 1978 and March 5, 1979 represent the latest weeks for which audited circulation figures are available.

8. The value figures are derived by multiplying the number of subscription and newsstand sales by $.22 per copy and multiplying this figure by 51, the number of issues apparently

■ Consideration of subscription sales and newsstand sales within the District of Columbia on an annualized basis using the two dates noted above reveals an average annual revenue of $32,897.04, which represents approximately .7% of defendant's total sales. Defendant, however, argues that only newsstand sales within the District of Columbia should be considered, since ". . . the only sales transactions engaged in by defendant entirely within the District of Columbia are newsstand sales, subscription revenue being derived from acts and transactions performed by defendant outside the District." Defendant's Reply Memorandum of Points and Authorities in Support of Motion to Dismiss or to Change Venue, at 4. Defendant's argument is without merit, and is unsupported by case law or by the language of the statute. The statute refers to revenue derived from "goods used or consumed . . in the District of Columbia," not to revenue derived from acts engaged in entirely in the District of Columbia.

For guidance in determining whether the figures noted above constitute "substantial revenue," we turn to the test approved by this Circuit's Court of Appeals in *Founding Church of Scientology v. Verlag*, 536 F.2d 429 (D.C. Cir. 1976). ". . . the test looks *both* at the absolute amount and at the percentage of total sales, and determines which is 'substantial' on the facts of each case." *Id.* at 433. In that case, the Court found that $26,000 of revenue in ten months, representing 1% of total sales, was substantial revenue within the meaning of § (a)(4). That Court also cited with approval a Fourth Circuit decision [9] holding that

$37,000 of revenue representing one-half of 1% of total sales satisfied the "substantial revenue" provision of Virginia's long-arm statute, and noted that because the Maryland and Virginia statutes are similar and also derived from the Uniform Interstate and International Procedure Act, decisions construing these statutes are entitled to "substantial weight." *Id.* at 433.

■ We find that average total annual sales in the District of Columbia, of $32,-897.04, which represents approximately .7% of total sales, constitutes substantial revenue under the meaning of § (a)(4). We do not believe it would "offend traditional notions of fair play and substantial justice" to subject a publishing company doing this level of business in the District of Columbia to jurisdiction before courts located here.

### 3. *The Locus of the Act Causing Injury*

■ To summarize, we have found one of the two elements necessary for jurisdiction under § (a)(3) (injury in the District, if an injury occurred) and we have found two of the three elements necessary for jurisdiction under § (a)(4) (injury in the District if an injury occurred, and substantial revenue derived from goods used or consumed in the District). Thus, defendant will be susceptible to jurisdiction under § (a)(3) if it can be shown that the act or omission causing tortious injury occurred in the District of Columbia. Alternatively, defendant will be susceptible to jurisdiction under § (a)(4) if it can be shown that the act or omission causing tortious injury occurred outside the District of Columbia.

---

produced each year. The figure of $.22 per copy was derived from the Armstrong affidavit, which calculated newsstand revenues by using ". . . the average price of $.2161 per copy." Plaintiffs argue that the rounded-off figure of $.22 per copy should be used to calculate newsstand and subscription sales revenues since defendant had available but did not use actual sales and revenue figures. We agree. We also note that this per copy figure is substantially less than the one dollar cover price of the magazine. It is therefore possible that these value figures may be low. If defendant

knew these revenue figures (which were computed by plaintiffs) were higher than actual revenues received, it is not unrealistic to expect that defendant would have pointed this out in their reply memorandum. They did not do so.

**9.** *Ajax Realty Corp. v. J. F. Zook, Inc.*, 493 F.2d 818 (4th Cir. 1972).

We find it unnecessary to determine where the act occurred for purposes of asserting personal jurisdiction in this case, i. e. whether *in* or *outside* the District of Columbia. If the act, for purposes of the long-arm statute, occurred outside the District, jurisdiction is proper under § (a)(4). If the act, for purposes of the long-arm statute, occurred within the District, jurisdiction is proper under § (a)(3). Either way, this court has personal jurisdiction over defendant. We find that defendant is subject to the personal jurisdiction of this court pursuant to the District's long-arm statute without deciding whether the act occurred within the District or outside the District for purposes of this statute. Accordingly, we deny defendant's motion based on lack of jurisdiction.

B. *Motion to Dismiss for Improper Venue*

Plaintiffs seek to establish venue under 28 U.S.C. § 1391. Section 1391(a) provides that in cases brought solely under diversity of citizenship jurisdiction, venue is proper in the judicial district where all plaintiffs reside, were all defendants reside, "or in which the claim arose." Since neither all plaintiffs nor all defendants reside in the District of Columbia, venue is proper in this court only if the claim arose in the District of Columbia.

Because of its relevance to the question at hand, we quote this Circuit's approach to determining where the claim arose, taken in the context of determining venue under § 1391(b): [10]

. . . where 'the claim arose' should in our view be ascertained by advertence to events having operative significance in the case, and a *commonsense appraisal of* the implications of those events for accessibility to witnesses and records. And, though a proliferation of permissible forums is staunchly to be avoided, it is evident that the often unfruitful pursuit of a single locality as the one and only district in which the claim arose is not needed to ensure the efficient conduct of

the litigation. Not surprisingly, then, courts in some number have construed Section 1391(b) as conferring venue in a district where a substantial portion of the acts or omissions giving rise to the actions occurred, notwithstanding that venue might also lie in other districts. We endorse that interpretation wholeheartedly. So long as the substantiality of the operative events is determined by assessment of their ramifications for efficient conduct of the suit—an important step upon which we would unfailing insist—loyalty to the objectives of Section 1391(b) will be amply preserved.

*Lamont, et al v. Haig*, 590 F.2d 1124, 1134–35 (D.C. Cir. 1978).

The Supreme Court has also recently interpreted the scope of "where the claim arose," again in the contest of § 1391(b). We quote from that opinion:

In our view, therefore, the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim.

*Leroy, et al v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 2718, 61 L.Ed.2d 464 (1979).

As the above quotation indicates, the Supreme Court determined that in deciding where the claim arose under § 1391(b), a court may consider the availability of witnesses, the accessibility of other relevant evidence, and the convenience of defendants *but not* the convenience of plaintiffs. We believe the court would ignore the convenience of plaintiffs in considering venue under § 1391(b) because, unlike § 1391(a), § 1391(b) venue does not lie in the judicial

10. Section 1391(b) provides venue when subject matter jurisdiction is not founded solely on diversity of citizenship.

district in which all plaintiffs reside but only "where all defendants reside." We believe the court therefore reasoned that if the action could not be brought under § 1391(b) in the judicial district where all plaintiffs reside then the convenience of plaintiffs should not be considered in determining where the claim arose. Because venue may be had under § 1391(a) in the judicial district where all the plaintiffs reside, it would follow that we could consider the convenience of plaintiffs in determining where the claim arose. We shall do so, but we conclude we would have reached the same result without weighing this factor in this case.

Applying the guidelines outlined above, we conclude that venue under § 1391(a) is appropriate in this case. Much of the evidence relevant to this action is accessible, if at all, in the District of Columbia. Defendant Rose utilized and relied upon sources located in the District of Columbia. In particular, defendant Rose apparently based his identification of plaintiffs as SAVAK agents on information provided by officials and sources, many of whom were located in Washington, D. C. Plaintiffs allegedly conducted their business activity in the District of Columbia. Plaintiffs alleged work as SAVAK agents supposedly occurred in the District of Columbia in large part, if not entirely. Proof of the existence, nature, and extent of any injury in the District of Columbia will also necessarily involve witnesses and evidence in the District of Columbia. In addition, two of the three individual plaintiffs now reside in the Washington metropolitan area.

It is true, of course, that the article apparently was written, edited, and prepared for publication in New York. Editorial decisions relevant to this action were apparently made in New York. Evidence surrounding these decisions will likely be more accessible in New York. Defendant corporation and individuals residing in New York will likely suffer some inconvenience in litigating this action in the District of Columbia. However, we believe that the balance of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the parties tips decisively in favor of litigating this case in the District of Columbia. However, we note that an imbalance is not necessary. All that is required is that the action be brought in one of two or more districts which "may be assigned as the locus of the claim" with "approximately equal plausibility." *Leroy, et al v. Great Western United Corp., supra,* 99 S.Ct. at 2718. We find that plaintiffs' selection of this forum fits comfortably within that test.

It follows from the preceding discussion that defendant's alternate motion to transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1406(a) also be denied. In addition, as the Supreme Court said more than 30 years ago, ". . . unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

An order consistent with the foregoing has been entered this day.