Sidney **BLUMENTHAL** and Jacqueline Jordan Blumenthal, Plaintiffs,

v.

Matt **DRUDGE** and America Online, Inc., Defendants.

No. CIV.A. 97–1968 PLF.

United States District Court, District of Columbia.

April 22, 1998.

William Alden McDaniel, Jr., McDaniel & Marsh, Baltimore, MD, for Plaintiffs.

Jonathan Walker Emord, Emord & Assoc., P.C., Washington, DC, for Matt Drudge.

Patrick Joseph Carome, John Adolphus Payton, Jr., Wilmer, Cutler & Pickering, Washington, DC, for America Online, Inc.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This is a defamation case revolving around a statement published on the Internet by defendant Matt Drudge. On August 10, 1997, the following was available to all having access to the Internet:

> The DRUDGE REPORT has learned that top GOP operatives who feel there is a double-standard of only reporting republican shame believe they are holding an ace card: New White House recruit Sidney Blumenthal has a spousal abuse past that has been effectively covered up.
>
> The accusations are explosive.
>
> There are court records of Blumenthal's violence against his wife, one influential republican, who demanded anonymity, tells the DRUDGE REPORT.
>
> If they begin to use [Don] Sipple and his problems against us, against the Republican Party ... to show hypocrisy, Blumenthal would become fair game. Wasn't it Clinton who signed the Violence Against Women Act?
>
> [There goes the budget deal honeymoon.]

> One White House source, also requesting anonymity, says the Blumenthal wife-beating allegation is a pure fiction that has been created by Clinton enemies. [The First Lady] would not have brought him in if he had this in his background, assures the wellplaced staffer. This story about Blumenthal has been in circulation for years.
>
> Last month President Clinton named Sidney Blumenthal an Assistant to the President as part of the Communications Team. He's brought in to work on communications strategy, special projects themeing— a newly created position.
>
> Every attempt to reach Blumenthal proved unsuccessful.

Complaint, Ex. 4.

Currently before this Court are a motion for summary judgment filed by defendant America Online, Inc. ("AOL") and a motion to dismiss or transfer for lack of personal jurisdiction filed by defendant Matt Drudge. Upon consideration of the papers filed by the parties and the oral arguments of counsel, the Court concludes that AOL's motion should be granted and Drudge's motion should be denied.

## I. BACKGROUND

Plaintiffs Sidney Blumenthal and Jacqueline Jordan Blumenthal are citizens of the District of Columbia and have continuously lived in the District since 1985. Complaint ¶¶ 1–2, 12. Sidney Blumenthal works in the White House as an Assistant to the President of the United States. His first day of work as Assistant to the President was Monday, August 11, 1997, the day after the publication of the alleged defamatory statement. Jacqueline Jordan Blumenthal, Sidney Blumenthal's wife, also works in the White House as Director of the President's Commission On White House Fellowships. Complaint ¶¶ 13, 16–17.

Defendant Matt Drudge, a Takoma Park, Maryland native, is a resident of the State of California, where he has lived continuously since 1987. Complaint, Ex. 8; Drudge Motion to Dismiss ("Drudge Motion"), Declara-

tion of Matt Drudge ("Drudge Decl. I") ¶ 2.[1] In early 1995, defendant Drudge created an electronic publication called the Drudge Report, a gossip column focusing on gossip from Hollywood and Washington, D.C. Transcript of March 11, 1998 Motions Hearing ("Hearing Tr.") at 41. Mr. Drudge's base of operations for writing, publishing and disseminating the Drudge Report has been an office in his apartment in Los Angeles, California. Drudge Decl. I ¶¶ 2–4.

Access to defendant Drudge's world wide web site is available at no cost to anyone who has access to the Internet at the Internet address of "www.drudgereport.com." Drudge Decl. I ¶ 9. The front page of the web site contains the logo "Drudge Report." Defendant Drudge has also placed a hyperlink on his web site that, when activated, causes the most recently published edition of the Drudge Report to be displayed. *Id.*[2] The web site also contains numerous hyperlinks to other on-line news publications and news articles that may be of interest to readers of the Drudge Report. Id. In addition, during the time period relevant to this case, Drudge had developed a list of regular readers or subscribers to whom he e-mailed each new edition of the Drudge Report. Drudge Decl. I ¶¶ 6–7. By March 1995, the Drudge Report had 1,000 e-mail subscribers, Drudge Decl. I ¶ 8; and plaintiffs allege that by 1997 Drudge had 85,000 subscribers to his e-mail service. Complaint ¶ 47.

In late 1996, defendant Drudge entered into a six-month licensing agreement with the publisher of "Wired" magazine. Under the agreement, the publisher of "Wired" had the right to receive and display future editions of the Drudge Report in "Hotwired," a new electronic Internet publication. In exchange, defendant Drudge received a bi-weekly royalty payment. In addition to the

publication of the Drudge Report in "Hotwired," defendant Drudge continued to distribute each new edition via e-mail to his subscribers and via his world wide web site. Drudge Decl. I ¶¶ 11–12.

In late May or early June of 1997, at approximately the time when the "Wired" licensing agreement expired, defendant Drudge entered into a written license agreement with AOL.[3] The agreement made the Drudge Report available to all members of AOL's service for a period of one year. In exchange, defendant Drudge received a flat monthly "royalty payment" of $3,000 from AOL. During the time relevant to this case, defendant Drudge has had no other source of income. Drudge Decl. I ¶¶ 13–14. Under the licensing agreement, Drudge is to create, edit, update and "otherwise manage" the content of the Drudge Report, and AOL may "remove content that AOL reasonably determine[s] to violate AOL's then standard terms of service." AOL Mem. at 7; *see* Exhibit C to Licensing Agreement ¶ I, Ex. A to Jennings Decl. Drudge transmits new editions of the Drudge Report by e-mailing them to AOL. AOL then posts the new editions on the AOL service. AOL Mem., Declaration of Matt Drudge ("Drudge Decl. II") ¶ 17; AOL Mem. at 9. Drudge also has continued to distribute each new edition of the Drudge Report via e-mail and his own web site. Drudge Decl. I ¶ 16; Hearing Tr. at 41–42.

Late at night on the evening of Sunday, August 10, 1997 (Pacific Daylight Time), defendant Drudge wrote and transmitted the edition of the Drudge Report that contained the alleged defamatory statement about the Blumenthals. Drudge transmitted the report from Los Angeles, California by e-mail to his direct subscribers and by posting both a headline and the full text of the Blumenthal story on his world wide web site. He then

---

1. Takoma Park, Maryland is a suburb of the District of Columbia.

2. Through a "hyperlink," a browser may connect to another web site by clicking on the specially highlighted text or images on the initial web site. After clicking on the highlighted text, the browser is then directly taken to that particular web site. Complaint ¶ 35.

3. According to AOL, it operates "the world's largest interactive computer service. AOL's

more than nine million subscribers use the AOL service as a conduit to receive and disseminate vast quantities of information by means of modern connections to AOL's computer network." Memorandum of Points and Authorities in Support of Defendant America Online, Inc.'s Motion for Summary Judgment ("AOL Mem.") at 3; *see* Declaration of Robert Jennings ("Jennings Decl.") ¶ 4, Exhibit 1 to AOL Mem.

transmitted the text but not the headline to AOL, which in turn made it available to AOL subscribers. Drudge Decl. I ¶¶ 15, 16, 19.[4]

After receiving a letter from plaintiffs' counsel on Monday, August 11, 1997, Complaint, Ex. 6, defendant Drudge retracted the story through a special edition of the Drudge Report posted on his web site and e-mailed to his subscribers. Drudge Decl. I ¶¶ 17–19. At approximately 2:00 a.m. on Tuesday, August 12, 1997, Drudge e-mailed the retraction to AOL which posted it on the AOL service. Drudge Decl. I ¶ 19; AOL Mem. at 12.[5] Defendant Drudge later publicly apologized to the Blumenthals. Drudge Decl. I ¶ 20; Complaint, Ex. 6 (Howard Kurtz, *Blumenthals Get Apology, Plan Lawsuit: Web Site Retracts Story on Clinton Aide, Washington Post,* August 11, 1997, at A 11).

## II. AOL's MOTION FOR SUMMARY JUDGMENT

### A. *The Internet*

"The Internet is a unique and wholly new medium of worldwide human communication." *Reno v. American Civil Liberties Union,* —— U.S. ——, ——, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997).[6] It enables people to communicate with one another with unprecedented speed and efficiency and is rapidly revolutionizing how people share and receive information. As Congress recognized in the Communications Decency Act of 1996, "the rapidly developing array of Internet and other interactive computer services ... represent an extraordinary advance in the availability of educational and informational resources to our citizens." 47 U.S.C. § 230(a)(1). As one court has noted:

> The Internet has no territorial boundaries. To paraphrase Gertrude Stein, as far as the Internet is concerned, not only is there perhaps "no there there," the "there" is *everywhere* where there is Internet access. When business is transacted over a computer network via a Web-site accessed by a computer in Massachusetts, it takes place as much *in* Massachusetts, literally or figuratively, as it does anywhere.

*Digital Equipment Corp. v. Altavista Technology, Inc.,* 960 F.Supp. 456, 462 (D.Mass. 1997).[7]

4. The headline read: "Charge: New White House Recruit Sidney Blumenthal Has Spousal Abuse Past." Complaint, Ex. 2.

5. AOL later removed the August 10 edition of the Drudge Report from the electronic archive of previous editions of the Drudge Report available to AOL subscribers. AOL Mem. at 13.

6. "The term 'Internet' means the international computer network of both Federal and non-Federal interoperable packet switched data networks." 47 U.S.C. § 230(e)(1). The Internet is "not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks." *ACLU v. Reno,* 929 F.Supp. 824, 830 (E.D.Pa. 1996), *aff'd,* —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The "web" is a "vast decentralized collection of documents containing text, visual images, and even audio clips.... The web is designed to be inherently accessible from every Internet site in the world." Stephen Wilske and Teresa Schiller, *International Jurisdiction In Cyberspace: Which States May Regulate The Internet?,* 50 FED. COM. L.J. 117, 140 (1997).

7. It is probably safe to say that more ideas and information are shared on the Internet than in any other medium. But when we try to pin down the location of this exchange, we realize how slippery our notion of the Internet really is. Perhaps this is because "cyberspace" is not a "space" at all. At least not in the way we understand space. It's not located anywhere; it has no boundaries; you can't "go" there. At the bottom, the Internet is really more idea than entity. It is an agreement we have made to hook our computers together and communicate by way of binary impulses and digitized signals sent over telephone wires.

> \*   \*   \*   \*   \*   \*

Risking overstatement only slightly, the Internet represents a brave new world of free speech. The number of people regularly using the Internet is expected to grow to 100 million by the year 2000. Arguably, the Internet will become as prevalent in our daily lives as the printing press, telephone, radio, and television....

[T]he Internet is fundamentally different from traditional forms of mass communication in at least three important respects. First, the Internet is capable of maintaining an unlimited number of information sources, ... Second, the Internet has no "gatekeepers"—no publishers or editors controlling the distribution of information.... Finally, the users of Internet information are also its producers. But every person who taps into the Internet is his [or her] own

The near instantaneous possibilities for the dissemination of information by millions of different information providers around the world to those with access to computers and thus to the Internet have created ever-increasing opportunities for the exchange of information and ideas in "cyberspace." [8] This information revolution has also presented unprecedented challenges relating to rights of privacy and reputational rights of individuals, to the control of obscene and pornographic materials, and to competition among journalists and news organizations for instant news, rumors and other information that is communicated so quickly that it is too often unchecked and unverified. Needless to say, the legal rules that will govern this new medium are just beginning to take shape.

### B. *Communications Decency Act of 1996, Section 230*

In February of 1996, Congress made an effort to deal with some of these challenges in enacting the Communications Decency Act of 1996. While various policy options were open to the Congress, it chose to "promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market" for such services, largely "unfettered by Federal or State regulation...." 47 U.S.C. § 230(b)(1) and (2). Whether wisely or not, it made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others. In recognition of the speed with which information may be disseminated and the near impossibility of regulating information content, Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others. While Congress could have made a different policy choice, it opted not to hold interactive computer services liable for their failure to edit, withhold or restrict access to offensive material disseminated through their medium.

Section 230(c) of the Communications Decency Act of 1996 provides:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1). The statute goes on to define the term "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(e)(3). In view of this statutory language, plaintiffs' argument that the *Washington Post* would be liable if it had done what AOL did here— "publish Drudge's story without doing anything whatsoever to edit, verify, or even read it (despite knowing what Drudge did for a living and how he did it)," Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant America Online, Inc.'s Motion for Summary Judgment ("Pls.' Mem.") at 1—has been rendered irrelevant by Congress.

██ Plaintiffs concede that AOL is a "provider ... of an interactive computer ser-

---

journalist. In other words, the Internet has shifted the focus of mass communication to the individual ... Never before has it been so easy to circulate speech among so many people.

\* \* \* \* \* \*

John Doe can now communicate with millions of people from the comfort, safety and privacy of his own home. His communication requires minimal investment and minimal time—once the word is written, it is disseminated to a mass audience literally with the touch of a button. Moreover, Internet speakers are not restricted by the ordinary trappings of polite conversation; they tend to speak more freely online.

Bruce W. Sanford and Michael J. Lorenger, *Teaching An Old Dog New Tricks: The First Amendment In An Online World*, 28 Conn. L.Rev. 1137, 1139–43 (1996).

8. " 'Cyberspace' refers to the interaction of people and businesses over computer networks, electronic bulletin boards, and commercial online services. The largest and most visible manifestation of cyberspace is the Internet...." R. Timothy Muth, *Old Doctrines On A New Frontier: Defamation and Jurisdiction In Cyberspace*, Wis. LAW. 10, 11 (Sept.1995), *available in* Westlaw at 68–SEP WILAW 10; *see also ACLU v. Reno*, 929 F.Supp. at 830–38.

vice" for purposes of Section 230, *see* Complaint ¶ 94; Pls.' Mem. at 3, and that if AOL acted exclusively as a provider of an interactive computer service it may not be held liable for making the Drudge Report available to AOL subscribers. *See* 47 U.S.C. § 230(c)(1). They also concede that Drudge is an "information content provider" because he wrote the alleged defamatory material about the Blumenthals contained in the Drudge Report. Pls.' Mem. at 4. While plaintiffs suggest that AOL is responsible along with Drudge because it had some role in writing or editing the material in the Drudge Report, they have provided no factual support for that assertion. Indeed, plaintiffs affirmatively state that "no person, other than Drudge himself, edited, checked, verified, or supervised the information that Drudge published in the Drudge Report." Plaintiffs' Statement of Material Facts ("Pls.' Stmt.") ¶ 1(ii). It also is apparent to the Court that there is no evidence to support the view originally taken by plaintiffs that Drudge is or was an employee or agent of AOL, and plaintiffs seem to have all but abandoned that argument.[9]

AOL acknowledges both that Section 230(c)(1) would not immunize AOL with respect to any information AOL developed or created entirely by itself and that there are situations in which there may be two or more information content providers responsible for material disseminated on the Internet—joint authors, a lyricist and a composer, for example. Defendant America Online, Inc.'s Reply Memorandum In Further Support of Its Motion for Summary Judgment ("AOL Reply Mem.") at 10; Hearing Tr. at 12. While Section 230 does not preclude joint liability for the joint development of content, AOL maintains that there simply is no evidence here that AOL had any role in creating or developing any of the information in the Drudge Report. The Court agrees. It is undisputed that the Blumenthal story was written by Drudge without any substantive or editorial involvement by AOL. Drudge Decl. II ¶¶ 46–47. AOL was nothing more than a provider of an interactive computer service on which the Drudge Report was carried, and Congress has said quite clearly that such a provider shall not be treated as a "publisher or speaker" and therefore may not be held liable in tort. 47 U.S.C. § 230(c)(1).

As Chief Judge Wilkinson recently wrote for the Fourth Circuit:

By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.

The purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

\*     \*     \*     \*     \*     \*

9. Plaintiffs' Statement of Genuine Issues of Material Facts does not identify any evidence to support their conclusory assertion that there are genuine issues of fact as to whether Drudge was an employee or agent of AOL. *See* Pls.' Stmt. ¶¶ 3–4, 12. When a party opposing a motion for summary judgment seeks to rebut facts set forth in the movant's Statement of Material Facts by merely citing to allegations in the complaint rather than citing to evidence in the record or providing evidentiary support through affidavits or other competent evidence, those facts may be deemed admitted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Twist v. Meese,* 854 F.2d 1421, 1424 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *Glovinsky v. Cohen,* 983 F.Supp. 1, 2–3 (D.D.C.1997); *United States v. BCCI Holdings (Luxemborg). S.A.,* 977 F.Supp. 1, 6 (D.D.C.1997); *see also* Rule 56(e), Fed.R.Civ.P. and Local Rule 108(h).

None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability. While Congress acted to keep government regulation of the Internet to a minimum, it also found it to be the policy of the United States "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking and harassment by means of computer." *Id.* § 230(b)(5). Congress made a policy choice, however, not to deter harmful on-line speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.

*Zeran v. America Online, Inc.,* 129 F.3d 327, 330–31 (4th Cir.1997). The court in *Zeran* has provided a complete answer to plaintiffs' primary argument, an answer grounded in the statutory language and intent of Section 230.[10]

■ Plaintiffs make the additional argument, however, that Section 230 of the Communications Decency Act does not provide immunity to AOL in this case because Drudge was not just an anonymous person who sent a message over the Internet through AOL. He is a person with whom AOL contracted, whom AOL paid $3,000 a month—$36,000 a year, Drudge's sole, consistent source of income—and whom AOL promoted to its subscribers and potential subscribers as a reason to subscribe to AOL. Pls.' Mem. at 2, 7. Furthermore, the license agreement between AOL and Drudge by its terms contemplates more than a passive role for AOL; in it, AOL reserves the "right to remove, or direct [Drudge] to remove, any content which, as reasonably determined by AOL ... violates AOL's then-standard Terms of Service...." Jennings Decl. ¶ 16 (quoting Exhibit C to Licensing Agreement ¶ I, Ex. A to Jennings Decl.). By the terms of the agreement, AOL also is "entitled to require reasonable changes to ... content, to the extent such content will, in AOL's good faith judgment, adversely affect operations of the AOL network." *Id.*

In addition, shortly after it entered into the licensing agreement with Drudge, AOL issued a press release making clear the kind of material Drudge would provide to AOL subscribers—gossip and rumor—and urged potential subscribers to sign onto AOL in order to get the benefit of the Drudge Report. The press release was captioned: "AOL Hires Runaway Gossip Success Matt Drudge." Complaint, Ex. I. It noted that "[m]averick gossip columnist Matt Drudge has teamed up with America Online," and stated: "Giving the Drudge Report a home on America Online (keyword: Drudge) opens up the floodgates to an audience ripe for Drudge's brand of reporting.... AOL has made Matt Drudge instantly accessible to members who crave instant gossip and news breaks." *Id.* Why is this different, the Blumenthals suggest, from AOL advertising and promoting a new purveyor of child pornography or other offensive material? Why should AOL be permitted to tout someone as a gossip columnist or rumor monger who will make such rumors and gossip "instantly accessible" to AOL subscribers, and then claim immunity when that person, as might be anticipated, defames another?

If it were writing on a clean slate, this Court would agree with plaintiffs. AOL has certain editorial rights with respect to the content provided by Drudge and disseminated by AOL, including the right to require changes in content and to remove it; and it has affirmatively promoted Drudge as a new source of unverified instant gossip on AOL. Yet it takes no responsibility for any damage he may cause. AOL is not a passive conduit like the telephone company, a common carrier with no control and therefore no responsibility for what is said over the telephone wires.[11] Because it has the right to exercise editorial control over those with whom it contracts and whose words it disseminates, it would seem only fair to hold AOL to the liability standards applied to a publisher or, at least, like a book store owner or library, to the liability standards applied to a distribu-

---

10. *See infra* n. 13.

11. *See* David J. Goldstone, *A Funny Thing Happened On The Way To the Cyber Forum: Public*

*vs. Private in Cyberspace Speech,* 69 U. COLO. L REV. 1, 40–48 (1998).

tor.[12] But Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others. In some sort of tacit *quid pro quo* arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted.

In Section 230(c)(2) of the Communications Decency Act, Congress provided:

No provider or user of an interactive computer service shall be held liable on account of—

(A) Any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c)(2).[13] As the Fourth Circuit stated in *Zeran:* "Congress enacted § 230 to remove ... disincentives to self-

regulation.... Fearing that the specter of liability would ... deter service providers from blocking and screening offensive material .... § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and selfregulatory functions." *Zeran v. America Online, Inc.,* 129 F.3d at 331.[14]

Any attempt to distinguish between "publisher" liability and notice-based "distributor" liability and to argue that Section 230 was only intended to immunize the former would be unavailing. Congress made no distinction between publishers and distributors in providing immunity from liability. As the Fourth Circuit has noted: "[I]f computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement—from any party, concerning any message," and such notice-based liability "would deter service providers from regulating the dissemination of offensive material over their own services" by confronting them with "ceaseless choices of suppressing controversial speech or sustaining prohibitive liability"—exactly what Congress intended to insulate them from in Section 230. *Zeran v. America Online, Inc.,* 129 F.3d at 333. *C.f.Cubby, Inc. v. CompuServe, Inc.,* 776 F.Supp. 135, 139–40 (S.D.N.Y.1991) (decided before enactment of Communications Decency Act). While it appears to this Court that AOL in this case has taken advantage of all

**12.** *See* Douglas B. Luffman, *Defamation Liability For On–Line Services: The Sky Is Not Falling,* 65 GEO WASH. L. REV. 1071, 1083–85 (1997); David R. Sheridan, *Zeran v. AOL And The Effect Of Section 230 Of The Communications Decency Act Upon Liability for Defamation On The Internet,* 61 ALB. L REV 147, 167–77 (1997).

**13.** While this provision of the statute primarily addresses obscenity and violent material, it also references material that is "otherwise objectionable," a broad enough category to cover defamatory statements as well. Indeed, the legislative history makes clear that one of the primary purposes of Section 230 was to overrule the *Stratton Oakmont* decision of a New York State court that was itself a defamation case in which Prodigy Services, an Internet computer service like AOL, was held liable as a publisher of defamatory material. *See Stratton Oakmont, Inc. v. Prodigy Services Co.,* 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995). As the Conference Report stated:

One of the specific purposes of this section is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material. The conferees believe that such decisions create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services.

H.R. CONF. REP. No. 104–458, at 194 (1996).

**14.** 47 U.S.C. § 230(b)(4) provides:

It is the policy of the United States to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material.

the benefits conferred by Congress in the Communications Decency Act, and then some, without accepting any of the burdens that Congress intended, the statutory language is clear: AOL is immune from suit, and the Court therefore must grant its motion for summary judgment.[15]

## III. DRUDGE'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

■ Defendant Drudge has moved, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for an order dismissing this action for lack of personal jurisdiction or, alternatively, to transfer it to the United States District Court for the Central District of California. In order for this Court to maintain personal jurisdiction over a nonresident defendant, jurisdiction must be proper under the District of Columbia long-arm statute and consistent with the demands of due process. *United States v. Ferrara*, 54 F.3d 825, 828 (D.C.Cir.1995); *Crane v. Carr*, 814 F.2d 758, 762 (D.C.Cir.1987). Plaintiffs have the burden of establishing that this Court has personal jurisdiction over defendant Drudge and alleging specific facts upon which personal jurisdiction may be based. *See Cellutech Inc. v. Centennial Cellular Corp.*, 871 F.Supp. 46, 48 (D.D.C.1994).

### A. D.C. Long–Arm Statute

■ The only provision of the District of Columbia long-arm statute that is relevant to this case is Section 13–423(a)(4), which provides:

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's ... causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the District of Columbia.

D.C.Code § 13–423(a)(4). In order to establish personal jurisdiction under this provision a plaintiff must make a *prima facie* showing that (1) plaintiff suffered a tortious injury in the District of Columbia; (2) the injury was caused by the defendant's act or omission outside of the District of Columbia; and (3) defendants had one of three enumerated contacts with the District of Columbia. *Trager v. Berrie*, 593 F.Supp. 223, 225 (D.D.C.1984); *Akbar v. New York Magazine Co.*, 490 F.Supp. 60, 63 (D.D.C.1980). Plaintiffs must satisfy all three requirements and also establish minimum contacts within the confines of due process before the Court can exercise personal jurisdiction over defendant Drudge.

■ It is undisputed that the Drudge Report transmission in question was written, published and transmitted by defendant Drudge from his computer located in Los Angeles, California. It is also undisputed that the tortious injury caused by defendant Drudge's act of transmitting the report was suffered by the Blumenthals in the District of Columbia. The only question before this Court therefore is whether defendant

---

**15.** With respect to the portions of AOL's motion for summary judgment that do not depend on Section 230, plaintiffs have made no attempt to refute AOL's showing that it cannot be liable for Drudge's alleged oral statements to the press, which are the subject of Counts 9 through 20 of their complaint, because AOL had no role whatsoever in the formulation or dissemination of those statements and Drudge did not act on AOL's behalf in allegedly making them. *See* AOL Mem. at 41–42. Plaintiffs' only response to AOL on these points was a suggestion that they would like to take discovery. But plaintiffs have failed to make even the rudimentary showing required by Rule 56(f) of the Federal Rules of Civil Procedure that, without discovery, they are unable to "present by affidavit facts essential to justify

[their] opposition [to summary judgment]." *See* Rule 56(f), Fed.R.Civ.P.; *see also First Chicago Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1380–81 (D.C.Cir.1988); *Novecon, Ltd. v. Bulgarian-American Enterprise Fund*, 977 F.Supp. 52, 54 (D.D.C.1997).

Plaintiffs have also effectively conceded that AOL is entitled to summary judgment with respect to the first four counts of the complaint, which relate solely to an allegedly defamatory headline that appeared on Drudge's own web site but did not appear on the AOL service. *See* AOL Mem. at 17 n. 11; Statement of Material Facts As To Which Defendant America Online, Inc. Contends There Is No Genuine Issue ("AOL Facts") ¶ 72. *See supra* at —— and n. 4.

Drudge (1) regularly does or solicits business in the District of Columbia, *or* (2) derives substantial revenue from goods used or consumed or services rendered in the District, *or* (3) engages in any other persistent course of conduct here. *See* D.C.Code § 13–423(a)(4).

Justice Ginsburg in *Crane v. Carr* has described these as the "plus factors," factors that demonstrate some "reasonable connection" between the jurisdiction in which the court sits "separate from and in addition to" the injury caused in the jurisdiction. *Crane v. Carr,* 814 F.2d at 762. The "plus factor" or factors need not be related to the act that caused the injury; all that is required is "some other reasonable connection between the defendant and the forum." *Id.* at 762–63. The "plus factor" does not itself provide the basis for jurisdiction (the injury does) "but it does serve to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliation with the forum." *Id.* at 763. The question here is whether plaintiffs have shown a "persistent course of conduct" by defendant Drudge in the District of Columbia or other reasonable connections between the District and Drudge besides the alleged defamatory statement and the alleged injury.

Plaintiffs point out that the Drudge Report has been regularly transmitted over the Internet to Drudge's subscribers and repeatedly posted on Drudge's web site, where it has been available 24 hours a day to District residents; that Drudge personally maintains a list of e-mail addresses, which enables him to distribute the Drudge Report to anyone who requests it, including e-mail addresses in the District of Columbia; and that he has solicited contributions and collected money from persons in the District of Columbia who read the Drudge Report. Plaintiff's Opposition to Defendant Drudge's Motion to Dismiss ("Pls.' Opp'n") at 19–21. In addition, they state that Drudge has traveled to the District of Columbia twice, including once for a C–SPAN interview that was for the express purpose of promoting the Drudge Report. Pls.' Opp'n at 20. Plaintiffs also note, and defendant Drudge admits, that Drudge has been in contact (via e-mail, telephone and the U.S. mail) with District residents who supply him with gossip. Hearing Tr. at 51, 61–63; Drudge Decl. I ¶¶ 25, 27, 31.

Defendant Drudge argues that he has not specifically targeted persons in the District of Columbia for readership, largely because of the non-geographic nature of communicating via the Internet. For example, while it is true that subscribers to the Drudge Report include District residents, generally the only information about those subscribers available to Drudge is an e-mail address—an address that, unlike a postal address or even a telephone number, typically provides no geographic information. For instance, if Jane Doe from the District of Columbia subscribes to the Drudge Report, it is most likely sent to an e-mail address such as "jane-doe@aol.com," and Drudge has no idea where Jane Doe lives or receives the Report. The same is true for on-line browsers who read the Drudge Report, since screen names used to browse the web also are not generally identified by geographic location. Defendant Drudge also claims that he has never advertised the Drudge Report column or web site in physical locations or in local newspapers in the District of Columbia. Drudge Decl. I ¶¶ 28–30, 33; Hearing Tr. at 42–43.

Defendant Drudge also argues that his travel to Washington, D.C. is not sufficient to establish a persistent course of conduct in the District of Columbia because his contacts have been so infrequent and sporadic that they are simply not enough to be viewed as "persistent." As for his solicitation of contributions in the District of Columbia, Drudge claims that his solicitation was directed to all readers of the Drudge Report and not specifically aimed at the District. Furthermore, from that appeal Drudge received only approximately $250 from fewer than fifteen persons in the District of Columbia. Drudge Decl. I ¶ 24; Hearing Tr. at 49–50. The Court concludes that plaintiffs have the better of the argument; defendant Drudge has had sufficient contacts with the District of Columbia to warrant the exercise of personal jurisdiction.

The legal questions surrounding the exercise of personal jurisdiction in "cyberspace" are relatively new, and different courts have

reached different conclusions as to how far their jurisdiction extends in cases involving the Internet. Generally, the debate over jurisdiction in cyberspace has revolved around two issues: passive web sites versus interactive web sites, and whether a defendant's Internet-related contacts with the forum combined with other non-Internet related contacts are sufficient to establish a persistent course of conduct. As one court has explained:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997).

In *Heroes, Inc. v. Heroes Foundation*, Judge Flannery found that he did not need to decide whether the defendant's home page by itself subjected the defendant to personal jurisdiction in the District of Columbia because the defendant had substantial non-Internet related contacts with the District that were sufficient under the D.C. long-arm statute. The defendants's home page solicited contributions and provided a toll-free number which browsers used to donate money; the solicitation also appeared in advertisements in the Washington Post. Judge Flannery con-cluded that these non-Internet related contacts with the District of Columbia, together with the maintenance of a web site constantly available to D.C. residents, constituted a persistent course of conduct that reasonably connected the defendant to the forum. *Heroes, Inc. v. Heroes Foundation*, 958 F.Supp. 1, 4–5 (D.D.C.1996); *see also Telco Communications v. An Apple A Day*, 977 F.Supp. 404, 407 (E.D.Va.1997) (posting of web site advertisement solicitation over the Internet, which could be accessed by Virginia residents 24 hours a day, is a persistent course of conduct; two or three press releases rise to the level of regularly doing or soliciting business); *Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F.Supp. at 467 (maintenance of web site that can be accessed by Massachusetts citizens 24 hours a day coupled with other contacts is persistent course of conduct sufficient to confer personal jurisdiction).[16] The courts in each of these cases required only a relatively tenuous electronic connection between the creator of a web site and the forum to effect personal jurisdiction, so long as there were sufficient other non-Internet connections.

As noted, many courts have focused on the level of interactivity of a web site in determining whether there was personal jurisdiction. In *Cybersell, Inc. v. Cybersell, Inc.*, the court noted that an interactive web site allows users to "exchange information with the host computer" and concluded that courts must look at the "level of interactivity and [the] commercial nature of the exchange of information that occurs on the Web site to determine if sufficient contacts exist to warrant the exercise of jurisdiction." *Cybersell, Inc. v. Cybersell Inc.*, 130 F.3d 414, 418 (9th Cir.1997) (internal quotation marks omitted). *Compare Maritz, Inc. v. Cybergold, Inc.*, 947 F.Supp. 1328, 1332–33 (E.D.Mo.1996) (exercise of jurisdiction warranted where defendant's interactive web site encouraged browsers to add their address to mailing list that subscribed the user to the service), and *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952

---

**16.** The provisions of the long-arm statutes involved in *Telco* and *Digital Equipment* (Massachusetts long-arm statute, M.G.L. ch. 223A § 3(d); Virginia long-arm statute, Section 8.01–328.1(a)(4)) are quite similar to if not exactly the same as subsection (a)(4) of the District of Columbia long-arm statute.

F.Supp. at 1122–23 (interactive web site where defendants contracted with 3,000 individuals and seven internet providers in forum state conferred personal jurisdiction), *with Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295, 299–300 (S.D.N.Y.1996), *aff'd,* 126 F.3d 25 (2d Cir.1997) (passive web site which only posted information for interested persons who may have accessed the web site not sufficient for exercise of jurisdiction), and *Hearst Corporation v. Goldberger,* No. 96 Civ. 3620(PKL)(AJP), 1997 WL 97097, at * 15 (S.D.N.Y. Feb. 26, 1997) (no persistent course of conduct because defendant's passive web site only provided information regarding future services).

Under the analysis adopted by these courts, the exercise of personal jurisdiction is contingent upon the web site involving more than just the maintenance of a home page; it must also allow browsers to interact directly with the web site on some level. In addition, there must also be some other non-Internet related contacts between the defendant and the forum state in order for the court to exercise personal jurisdiction. Because the Court finds that defendant Drudge has an interactive web site that is accessible to and used by District of Columbia residents and, in addition, that he has had sufficient non-Internet related contacts with the District of Columbia, the Court concludes that Drudge has engaged in a persistent course of conduct

in the District. The exercise of personal jurisdiction over defendant Drudge by this Court therefore is warranted.[17]

Despite the attempts of Drudge and his counsel to label the Drudge Report as a "passive" web site, the Court finds this characterization inapt. The Drudge Report's web site allows browsers, including District of Columbia residents, to directly e-mail defendant Drudge, thus allowing an exchange of information between the browser's computer and Drudge's host computer. Hearing Tr. at 4243, 61; *see Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. at 1124. In addition, browsers who access the website may request subscriptions to the Drudge Report, again by directly e-mailing their requests to Drudge's host computer. In turn, as each new edition of the Drudge Report is created, it is then sent by Drudge to every e-mail address on his subscription mailing list, which includes the e-mail addresses of all browsers who have requested subscriptions by directly e-mailing Drudge through his web site. The constant exchange of information and direct communication that District of Columbia Internet users are able to have with Drudge's host computer via his web site is the epitome of web site interactivity.

■ Not only is defendant Drudge's web site interactive, the subject matter of the Drudge Report primarily concerns political

---

**17.** Defendant Drudge's reliance on this Court's decision in *Mallinckrodt v. Sonus Pharmaceuticals, Inc.* is misplaced. In *Mallinckrodt,* this Court held that an "AOL transmission from Seattle to Virginia, which was subsequently posted on an AOL electronic bulletin board and may have been accessed by AOL subscribers in the District of Columbia, cannot be construed as 'transacting business' in the District of Columbia" under subsection (a)(1) of the long-arm statute, D.C.Code § 13–423(a)(1). *Mallinckrodt v. Sonus Pharmaceuticals, Inc.,* 989 F.Supp. 265, 271 (D.D.C.1998). The defendant posted a message that was not sent to or from the District, the content of the message did not concern persons residing in the District or incorporated in the District, neither plaintiffs nor defendants worked or lived in the District, and the defendant's electronic bulletin board was in no way interactive, as is the case with the Drudge Report. This Court, therefore found that the defendant had no reasonable connection to the District, even though a person from the District may have read the message, because it had not engaged in "an act purposefully or foreseeably aimed at the Dis-

trict of Columbia." *Id.* The defendant's electronic bulletin board message therefore did not "constitute transacting business within the District of Columbia for purposes of [subsection (a)(1)] of the long-arm statute." *Id.* (internal quotations omitted).

With respect to subsection (a)(4) of the long-arm statute, the Court in *Mallinckrodt* concluded that plaintiffs fared no better, primarily because plaintiffs did not live or work in the District of Columbia and therefore did not "suffer[] any injury in the District of Columbia that they could not have suffered or did not suffer in any state in the nation where someone may have read the [AOL] message and reacted negatively toward plaintiffs." *Mallinckrodt v. Sonus Pharmaceuticals, Inc.,* 989 F.Supp. 265, 1998 WL 6546 at *8. The Blumenthals, by contrast, do live and work in the District of Columbia and suffered injury in the District. Furthermore, in contrast to the facts in *Mallinckrodt,* the Court finds that in this case defendant has engaged in a persistent course of conduct in the District of Columbia.

gossip and rumor in Washington, D.C. Defendant Drudge characterizes himself as the "Thomas Paine of the Internet, ... who is circulating information for the citizenry reporting on [federal] governmental abuses .... and earthquakes...at the White House." Hearing Tr. at 37, 41; see Pls.' Opp'n, Ex. 1. Even though Drudge may not advertise in physical locations or local newspapers in Washington, D.C., the subject matter of the Drudge Report is directly related to the political world of the Nation's capital and is quintessentially "inside the Beltway" gossip and rumor. Drudge specifically targets readers in the District of Columbia by virtue of the subjects he covers and even solicits gossip from District residents and government officials who work here. Drudge Decl. I ¶¶ 27, 31; Hearing Tr. at 61–63.[18] By targeting the Blumenthals who work in the White House and live in the District of Columbia, Drudge knew that "the primary and most devastating effects of the [statements he made] would be felt" in the District of Columbia. *Telco Communications v. An Apple A Day,* 977 F.Supp. at 407. He should have had no illusions that he was immune from suit here.

In addition, defendant Drudge also solicited contributions from District residents via the Drudge Report's homepage. While during the time period relevant to this case, defendant Drudge may have received only $250 from fifteen District of Columbia residents from that advertised solicitation, the Drudge Report was always accessible in the District, via AOL and through Drudge's world wide web site, making the advertised solicitation was repeatedly available to District residents.

Defendant Drudge also has had a number of non-Internet related contacts with the District. He sat for an interview with C–SPAN in Washington, D.C. and visited the District of Columbia on at least one other occasion. He also contacts District of Columbia residents via telephone and the U.S. mail in order to collect gossip for the Drudge Report. Drudge Decl. I ¶ 31; Hearing Tr. at

61. These non-Internet related contacts with the District of Columbia, coupled with the interactive nature of Drudge's web site, which particularly focuses on Washington gossip, are contacts that together are sufficient to establish that defendant Drudge engaged in a persistent course of conduct in the District of Columbia.

In sum, the Court concludes that the circumstances presented by this case warrant the exercise of personal jurisdiction under subsection (a)(4) of the District of Columbia long-arm statute because of: (1) the interactivity of the web site between the defendant Drudge and District residents; (2) the regular distribution of the Drudge Report via AOL, e-mail and the world wide web to District residents; (3) Drudge's solicitation and receipt of contributions from District residents; (4) the availability of the web site to District residents 24 hours a day; (5) defendant Drudge's interview with C–SPAN; and (6) defendant Drudge's contacts with District residents who provide gossip for the Drudge Report. The requirements of subsection (a)(4) of the District of Columbia long-arm statute have been satisfied.

### B. *Due Process*

▮▮▮ Traditionally, in order to exercise personal jurisdiction over an out-of-state defendant, a court must determine whether the defendant has sufficient minimum contacts with the jurisdiction in which the court sits such that maintenance of a suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). While in the Internet context there must be "something more" than an Internet advertisement alone "to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state," *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d at 414, such that he should "reasonably anticipate being haled into court" there, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), that test is

18. Drudge is not a reporter, a journalist or a newsgatherer. He is, as he himself admits, simply a purveyor of gossip. *See* Complaint, Exs. 6, 8. His argument that he should benefit from the "news gathering exception" to subsection (a)(4) of the long-arm statute merits no serious consideration. *Cf. Moncrief v. Lexington Herald–Leader Co.,* 807 F.2d 217, 221–22 (D.C.Cir.1986).

easily met here. *See, e.g., Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F.Supp. at 469–70. Because subsection (a)(4) of the long-arm statute does not reach the outer limits of due process, *Crane v. Carr*, 814 F.2d at 762, and the Court has concluded that there are sufficient "plus factors" to meet the requisites of subsection (a)(4), it follows that there are also sufficient minimum contacts to satisfy due process. Drudge's motion to dismiss or transfer for want of personal jurisdiction therefore will be denied.

SO ORDERED.